The next case is Broadcom v. International Trade Commission. If there is some particular aspect of confidential information that the court needs to be wary of, we'd need to have notice of that now or at some point before it would be disclosed. Does my counsel in the Broadcom case have any comments on that, just proceeding rather openly with this case? That's fine with us, Your Honor. I think we'd be talking at a fairly general level anyway. I think that's possible, but again, the briefs suggested to me that almost anything we would say could edge over into the confidential, at least as it was designated in the briefs. And an opinion. What's that? And an opinion. And the opinion is, of course, exactly the same situation. We have to write an opinion, and we would presume that unless you've given us some additional notice, we can write our opinion based on the briefs without too much concern. Broadcom agrees with that, Your Honor. ITC also. And thank you. I think I'll assume that unless I hear from my Kyocera counsel that the policy will apply to them too. We'll give them a chance just before their case begins. Judge Bryson had another matter before we began. Just a housekeeping matter. In going through the briefs, these were very long appendices, so it's not surprising that there looks like there may have been an omission from one of the appendix volumes, pages that are cited, I think in the blue brief, and without going into detail on this, if you look at pages 61 through 62, I think that's all of it. Of the blue brief in Broadcom, there is a citation to pages which I don't find in the place that's designated in Volume 6 of the Joint Appendix. We skip from A10694 to A12481, and there's some citations that are in the intervening pages. If we could have the intervening pages at the parties at some point, just provide them to us, that would be very helpful. Thank you, Your Honor. Great. Thank you. Then I believe we're ready to begin. Mr. Van Nest. Good morning. May it please the Court? If the Court will allow it, I would like to reserve five minutes of time for rebuttal. Certainly. I intend to confine my remarks this morning to the 311 patent and to two legal errors made by the Commission in connection with that patent. That's the patent that claims a power-saving state in a wireless communication network. First, it was error for the Commission to find no direct infringement by Qualcomm of Claim 1, which required only that the accused chipsets be, quote, operable in a power-saving state, merely because they weren't shown to have actually operated in that state on a Qualcomm test network. A claim that requires a device to be operable is infringed by a device which is capable of performing the operation whether or not it actually does so. And second, it was error to find no inducement. Despite finding direct infringement... Wouldn't it have been pretty easy to put in that last little piece of evidence? Your Honor... Show that Samsung or Motorola or somebody used it? We feel we did. Well, that's a different issue. That's a somewhat different issue, but it's kind of related to you didn't prove it. No question that Samsung and others used it because the Commission found they did. The Commission found infringement by them. But they say you didn't prove it by showing that the EVDO standard required it. Just to take that issue, no question that the chipsets were capable of this operation because the court found correctly that both the network providers and the handset makers were infringing. They were performing the operation. For example, at page 380 of the appendix, Judge Bullock found that certain EVDO networks as actually operated directly infringe Claim 1. And he further found at page 389, quote, utilize a protocol which, employed on a network, directly infringes Claim 1. Now, the question was when Qualcomm uses those same chips on a test network, do they infringe? Now, we established clearly that Qualcomm was using those chips loaded with software on their own test networks here in the United States, San Diego, Colorado, and elsewhere. That was established and really undisputed by Qualcomm. Those findings, the finding that the customers directly infringe and the finding that Qualcomm was using the chips on their own test network compelled a determination of direct infringement by Qualcomm. Why? Because the claim only requires that the chip be capable of that operation, be operable in that state. And this is directly controlled, I think, by the Intel case. In the Intel case, the claim there called for programmable selection means. Programmable selection means. Now, in the evidence, no customer was shown to have been told how to program the chip. No one ever proved a single sale of a chip programmed to operate in that mode. But this court affirmed the finding of infringement, holding that when a term like programmable or usable is employed in the claim, quote, the accused device need only be capable of operating in the relevant mode. Actual operation is not required. And this case really goes beyond those, because here we proved that the chips are operating in that mode when the customers use them, the network providers, the handset providers. We proved that much. So once that was demonstrated, and once we demonstrated that these chips loaded with this software were operated by Qualcomm itself, we were entitled to a finding of infringement. Now, turning next to the inducement claim, I want to start again with the critical. That's right up the alley in my question, isn't it? You have a gap there on inducement because you haven't proved the direct infringement. No, no. On inducement, Your Honor, we absolutely did prove direct infringement. The only issue on inducement is state of mind. Qualcomm is not arguing about proving direct infringement. They're arguing about state of mind. And here again, let's start with what Judge Bullock found. He found direct infringement by Qualcomm's customers. So, for example, at page 383 of the appendix, he found the handset manufacturers, Motorola, LG, Kyocera, they build chips with a power-saving protocol which infringes Claim 1 when used in a network. Clear, direct finding by Judge Bullock. He secondly found that the network operators are using chips inside handsets that actually infringe the claims calling for the power-saving function. That's at page 389 of the appendix. So there was a finding of direct infringement not only by the handset makers, but by the network operators. Now, it was also clear that Qualcomm itself encourages the use of its chips with this functionality. So, for example, undisputed, Qualcomm markets and sells these accused devices to the handset makers. Undisputed, they provide design assistance to handset makers to be certain the functionality will all be there. Undisputed, they enter into design partnerships with all their vendors, with all these handset makers. They're side-by-side with them designing the chips. How did you prove that Qualcomm induced these third parties to implement optional battery-saving protocols? What we proved, Your Honor, in particular is that they gave them the chips, they gave them the designs, they helped them design them, and they specifically promoted the power-saving features of the chips. So, for example, we put into evidence a whole host of data sheets and customer material. How does this square with our recent DSU en banc opinion on specific intent? Well, we acknowledge that DSU requires an intent to induce the infringement, not just an intent to perform an infringing act. We understand and acknowledge that. Here we proved three things. The chips directly infringe. Qualcomm is directing the customers on how to design them and how to use them, and they are specifically promoting the infringing features. They are specifically promoting the power-saving state that is claimed by the 311 patent. We also established they were aware of the patent. Two Broadcom witnesses testified that Qualcomm was fully aware of the 311 patent and its claims no later than March of 2005, and they haven't presented any evidence as to their state of mind. They're not saying they had a reasonable belief that their customers weren't infringing. They're not saying they had a reasonable belief that the patent was invalid. They're simply saying you didn't prove it, you didn't prove it, you didn't prove our intent. They're not in here with any sort of a defense based on their state of mind after they were aware of the 311 patent, when they continued repeatedly to promote the use of these chips and the power-saving features of them. Now, I recognize and we acknowledge that DSU is not met if all you show is that you induced a customer to perform an act which turns out to be infringing. Here they had to know. They had the patent. They knew what the claims were. They knew that Broadcom was contending that these power-saving features in these chips infringed, and yet, with that knowledge, they went out and specifically promoted those features with their customers, with whom they weren't really even at arm's length. They're in a design partnership where they're providing the design know-how, where they're providing the chip, where they're providing the software, where they're making sure, as their witnesses said over and over, that we want our customers to have the full functionality of our products, and that's why we're in design partnerships with them. That constitutes knowing inducement of infringement under any standard, under the old standard, under DSU, under any standard requiring a specific intent to cause the infringement. We met it, and it's particularly clear here, where they're not even contesting the direct infringement part of it as to customers, that the handset makers and the network providers are using their chips with their software to infringe our patent, and their claim on this issue is only, you haven't proved it under this higher DSU standard. They have no answer to the repeated promotion of the power-saving features of these chips, which was established and is clear in the Record D. Where was the finding that they knew of the patent and knew what the claims covered and knew that the power-saving features that were involved in these chips were infringing activity? Your Honor, there was no finding as to their knowledge, but there was undisputed evidence, and really this was not even an issue in the ITC proceeding, that Qualcomm had been made aware by Broadcom of the 311 patent. There was testimony from two Broadcom witnesses. Is that enough? I believe so. Once you have knowledge of the patent and knowledge of the claims, unless you're going to come forward with some argument that, well, we don't infringe... Don't you have to have knowledge of infringement as well? Aren't infringement... Aren't infringement analyses rather complex? They can be, Your Honor, but here the point is they haven't come forward with an expert that says this is not infringing activity. I mean, we established that the customers are all using the chips... No, but isn't the burden on you to prove that they had the intent, they had the knowledge, they knew it infringed, and then they encouraged them to infringe knowing it infringed? And isn't the gap that you haven't proved anybody knew that something infringed? I think, Your Honor, that there is no gap. I think that in a case like this... They had the patent, but did they know what infringed it or how it infringed it? You can prove intent by direct evidence or by circumstantial evidence, and obviously if you don't have generally a eureka admission by a respondent in every case, aha, I know I'm infringing. I would note here they haven't offered anything affirmative to support a belief that they felt it was not infringing. What we've proved here is clear infringement by the customers, knowledge of the patent, and the direct promotion of the features of the chip that infringe the claim. Well, that's certainly evidence of intent with respect to the acts, but it seems to me that you've got a problem with respect to the specific intent required under DSU. I think, Your Honor, we've met it here, particularly where there's an absence of any showing on their part of a reasonable belief that customers weren't infringing. Where we've shown the patent, and the patent clearly claims a power-saving feature, as Judge Bullock found, and where the promotional material that they're sending to their customers clearly promotes the use of that feature, that meets the test of DSU. And if the Court please, I'd like to reserve my time. No, no, we're going to be liberal with time. Go ahead. Okay, I have a question, if I could, on the 675 patent, and this is a little technical, but it's a lot technical, Your Honor. It is a lot technical. The phase-locked loop. Right. But what I want to call your attention to is the discussion of the RTF6150. That's the one outlier chip. Right. Okay. And the gain compensation circuit, which is recited in Claim 33, I think, of the 675. Now, if you look at the structure of the accused chip, the 6150, and I draw this from pages 29 through 30 of your brief. As I understand it, you've got an incoming current to the lower plane of the circuit, and that is identified as IREF50U, 50 microamps, I guess it is. And it goes to a series of unit current sources, and then the output of those unit current sources, which are influenced by the CT signal at that point, creates a current which then goes into the upper plane, where again we encounter a series of transistors that are influenced by the REF signal, as I understand it, and that outputs the reference pump current. Now, have I got that right? You do, Your Honor. Okay. Now, my question is, well, I actually have two questions. One is, where in this sequence of events do we find the reference scale current? And the second question is, how is it that the lower plane, which is the first step, which is identified as producing the reference pump current in the claim, how is it that that lower plane produces the reference pump current in the accused chip? Because it seems that it produces an intermediate current, not the reference pump current. Do you follow the question? I'm not sure I do, Your Honor. I do know that our position in the commission was that it's the entire structure there that is infringing, and that the commission erroneously looked only at a portion of it, and that therefore the current source, which we say was present in that particular chip, is found when you look at the structure you described as a whole. And that it was error for the court to have limited, not for the court. But if I understand claim 33, it lays out the two segments of the circuit. What appears in the accused device is the lower plane and the upper plane. The problem is that the output of the upper plane, which is the second thing, in the accused device is the reference pump current. But in the claim it looks like it's the output of what would be the lower plane, that is the reference pump current. So it doesn't seem to line up. Well, Your Honor, that's in fact one of the findings that the commission made, but our contention is you cannot separate. Now perhaps in claim 33 it's a little bit different issue than some of the other claims that were presented. But our complaint on the 675 is that the wrong structure, too little of the structure was identified to compare to the claim. All right, but as far as the reference scale current, can you identify for me in the sequence of currents, which of those currents is the reference scale current? I would have to look back at the past. Okay, well, maybe if you have a chance and you come back on rebuttal, you just can point me to which current it is, because it's referenced in the claim, but it doesn't seem to have an equivalent anywhere in the description of the accused device. I will attempt to do that.  Thank you, Your Honor. And I would like to reserve what remaining time I have for rebuttal. We'll reserve your entire rebuttal time, Mr. Van Ness. Mr. Liberman? You give Mr. Liberman an additional two minutes, which will compensate for the additional time we're giving Mr. Van Ness. You may proceed. Good morning. May it please the Court, Michael Liberman for the International Faith Commission. I will probably start with following up with the issues raised by Mr. Van Ness in his presentation. With respect to the 311 patent, I think that... Does the Intel case control this? If it's usable or programmable, is it also operable? Well, I think that the Intel case does not warrant any other determination other than the judge derived to in this case. With respect to the argument that operable here means that the chipsets as used in the handsets always infringe in the e-video compliant networks, it's just incorrect. Because in order to infringe, the fact... Well, the fact that they're operable doesn't mean that just by using these handsets with the accused chipsets will make them infringing devices. Because the e-video standard itself does not require the use of the chipsets in an infringing manner. And for that, there is clear evidence in the record. And I would point to testimony of the experts on both sides. Actually, Broadcom's own expert, Dr. Nettleton, testified on page 4715 of the appendix that his testimony supports the conclusion that e-video standard does not require the infringing use of the chipsets. Mr. Van Nest, I think, is not contesting that. What he's saying is that whether it requires it or not, as long as it is capable of operating in an infringing manner, it is infringement. The problem here is that it's not capable. The language operable doesn't mean that by just placing these chipsets in the handsets within the network makes it operable or capable of infringing. Because operable here means, in fact, it should be enabled to operate in a certain way. Unless the protocol within the e-video standard allows this chipset to operate in a certain infringing way, it's not infringing whether we use the term operable or operated. Because if we take this logic... Are you saying then that operable means it must always be infringing? It must require infringement? I am saying that operable means in order to... Because we didn't interpret it that way in Intel. We said programmable was infringing even if it wasn't always in an infringing mode. It was programmed to do it and therefore capable of infringing and that was enough. Wouldn't that work for operable here? No, there is a distinction between Intel and this case because here there is no proof that that was the intended use within the e-video standard. E-video standard allows for a different use of this chipset and I think that... So are you saying that the e-video standard doesn't require even the capability of using the power saver mode? It does not. Actually, e-video standard allows for the handset that would be engaged in continuing monitoring. So even if operable means capable, consistent with Intel, that there is still an absence of proof because the standard doesn't require even that. Exactly right. And I think that the decision of this court in Eckerbrand, it's a 2007 decision, is controlling here because the court in that case said that where there is... When the device is capable of being used in a non-infringing manner, there is an absence of proof of infringement and here we have exactly that. Experts and witnesses on both sides testified that e-video standard allows for the use of the accused chipsets in a non-infringing manner. Specifically, I can point to the standard itself and the standard... They infringed on the particular implementations of the e-video standard by certain third-party carriers and that was in addition to the functions required by the e-video standard. So the fact that these chipsets, and nobody argues about the fact, nobody disputes, that these chipsets can be used in an infringing manner. However, the issue was whether Qualcomm directly infringes or induces the infringement of these chipsets and there was lack of proof. And the judge specifically found, and that's page 8391, that the records doesn't support the claim of either direct infringement by Qualcomm or induced infringement by Qualcomm. With respect to the direct infringement, there is no dispute that there was no record evidence to show that the accused chipsets were used in a power-saving mode. And there is no dispute about that. The fact that they designed to be able to implement this feature doesn't mean that they were actually used in this way and that was the burden on the part of Broadcom to show that and they failed to show this use. Now, with respect to induced infringement, before even going to the question of intent, we have to resolve the issue of what actually was the subject of inducement. In this case, the judge found, and it's not disputed, that what was induced actually was the implementation of the EBDO standard or the use of the EBDO standard. And as I said, there is clear evidence that EBDO standard does not require the infringing use of the chipsets. And therefore, on both sides, on the side of the induced infringement and direct infringement, there is lack of proof on the part of Broadcom. What more did Broadcom have to prove to prove inducement? Well, they had to prove the necessary elements under the DSU decision, but they probably had to start with choosing the right object of their claim. And the right object of their claim would be EBDO standard plus something else. This plus is missing. They target EBDO standard, it's just they aim their own target. And no matter what they do after that, it won't give any benefit to them. It's that simple. Now, I also wanted to, unless there are some follow-up questions on this issue, because I... Peter asked earlier, just to make sure I understand your position. With respect to the term operable in the claims, what is it that needed to be done? Was there any physical or programming, physical action or programming that had to be done to the chips to render them capable of performing the power saving function? Well, the certain procedures actually implementing power saving should have been... Were those software or hardware procedures? No, it's software. And unless they implement it, the fact that it's called operable doesn't mean anything, because if we take this logic... Well, I mean, a PC is operable to do almost anything, I suppose, but you wouldn't say that it's unoperable to run a satellite system or something, even though there's enough software you could do it. Is that your argument, basically, that this was just too far back in the chain to be operable? Not enough had been done to turn the chip into something which, even though it didn't have to operate per the claims, it had to be operable per the claims? It's not even the question of how far it was removed. The issue is here that the necessary link is missing. It doesn't matter how far you remove. Arguably, you can say that something is operable just on the hardware. You don't need even the protocol, right? You can say, it's operable on this hardware. Why do you need the protocol? That would be the issue when you remove it too far. I'm not talking about that situation. I'm talking about the situation where there is a certain link that has to be implemented, certain piece of software, which is available, of course, but it's available in addition to what the EVDO standard requires. And if we miss this link, there is no way how you can prove this link. Thank you, Mr. Liberman. Mr. Kinnaird? May it please the Court. Mr. Van Ness' argument is premised on a misconception of the patent. He consistently referred to the patent claims as requiring chipsets operable in a power-saving mode. As opposed to the network? Exactly. These are network claims. They're not circuit claims, chip claims, or handset claims. And therefore, there's no dispute that operable means capable of operating. But what Broadcom spurred in approving was that there was an actual network terminal mode that was configured to operate at some point in time in a power-saving state. And that is what they never proved. By the way, this theory is newly minted on this appeal. It wasn't raised at all below. And if you look at what they cite in their petition for review, which is the only document they can rely on, they rely on a description of the patents, not on any issue raised to the Commission. But the key is that they had to actually establish how an actual network terminal mode was configured. And they had to do that not only for the network terminals, but they had to do that for the access points, because the claim limitation requires and recites certain behaviors that would be mandatory for the access points, such as beacon transmission, message notification, and synchronization with the terminals. And there was none of that. And that's what's fatal to their argument on direct infringement. What their burden of proving was to show, after the issue date of the patent in 2002, that Qualcomm actually built a test network with access points and terminals that were configured to actually engage in those behaviors. They produced no evidence of that whatsoever. All they attempted to prove was that all EDDO networks infringed and that Qualcomm had an EDDO network. So there's no question, especially under substantial evidence, that their direct infringement theory is unsustainable. And on the issue of Intel, first of all, I mean, that was programmable. That's a limited thing. But it's looking at the wrong level. What they're trying to point to is the generic capabilities of the chipsets that are available, the capabilities that are available to handset manufacturers. But that's, again, not what they have to do, because whether or not any terminal will operate in a power-saving mode depends both on the choices of the handset manufacturers and on the nature of the network in which they're implemented. So they cannot show infringement based on these generic capabilities divorced from any implementation in a network. On indirect infringement, first of all, we're not just contesting state of mind. We contest that there was no substantial evidence on any of the elements. And Mr. Van Ness continually referred to abundant evidence of specific promotion of power-saving by Qualcomm. But, of course, the commission found it the contrary. And there's nothing identified in their briefs that actually constitutes that evidence and certainly doesn't constitute the evidence sufficient to meet the substantial evidence standard on appeal, which is that it would constitute infringement as a matter of law. And the elements of DSU include not only specific intent, and I would say there's nothing there, no evidence whatsoever of specific intent. For one reason, the fact that Qualcomm continues to this very day to contest the construction of the claims, whether it infringes, and the validity of these patents. And it's not our burden to prove that we didn't have the specific intent. That's their burden to show. Any clever lawyer will always be able to avoid inducement if you say that all you require is to say that, well, we contest the construction of the claims. I mean, don't you have to sort of assume the claims to be valid in order to decide whether there's specific intent to infringe the claims as written? I mean, claim construction may be a separate issue, but at least with respect to validity. No, I don't think you do, Your Honor. And I would point out even in the lower standard of recklessness under Seagate, it has to be perfectly clear that they're valid. And so I think for specific intent, you'd have to find some evidence. But the fact that you've challenged the validity isn't enough, right? It may not be a complete defense. There's certainly valid evidence that we didn't have that specific intent. And it's their burden to bring forth evidence that, in fact, we did. But there's more than just specific intent. What evidence more could they have brought? Well, they could have brought some evidence of our interactions with, that we were actually promoting use and dealing with customers in ways that would indicate that we were actively inducing it. It's a high standard. It's an eating and abetting standard, Your Honor. And they have to come forth with evidence. But that's back to Judge Bryson's point. I mean, any lawyer will be smart enough to just put all of that promotion into advertising. You seem to be requiring something more, that they actually meet with customers and show them which buttons to push. Is that what you're requiring? Well, I think they can prove it. I don't think there's any restriction on the type of direct and circumstantial evidence on which they rely. But they're not entitled to a presumption that we believe that the patent is valid. Because otherwise, then every time a suit is brought, then you'd be subject to an inducement claim simply by defending yourself and continuing business as usual. Did Qualcomm provide the software that facilitates the infringing use? Well, Your Honor, it does provide the software to handset manufacturers. And they determine how to configure it, whether to be in power-saving modes or not. But again, under Dynacore... So you promote the power-saving mode, and you sell the enhancement that enables that, but you don't induce that use of what you're selling. There's no evidence whatsoever that we promote the power-saving mode. You're selling the way to do it, and you're advertising that people should buy your product and use your product as you suggest, but that's not asking them to buy it and use it? Well, I don't think the evidence shows that, Your Honor. And again, when you're promoting EDDO products and these MSM chips, the main things there are about a multimedia and high data rate transmission. Battery saving is old hat in this time in the cellular industry, and there's nothing there that would suggest that we were actually promoting the infringing use. And there was an uncontested finding against Broadcom on whether or not these have substantial non-infringing uses, and under Dynacore, just simply selling our products can't be there. If I could address... You seem to be, for direct infringement, hiding behind the fact that, well, you have to enhance the chip to make it work on the network. And then for inducements, you say, well, yeah, we do sell that, but that enhancement, and we do encourage its use, but we're still not inducing. Well, I don't think any... The Commission found that there was no evidence we encouraged the use, and let's remember this is a substantial evidence review. You don't want people to use what you sell? We want them to use the MSM chips, but it's up to the vendor whether or not they're going to implement the power-saving mode. And I think the other critical point here is that the earliest date that they contend that we had notice of the patent was March 30th of 2005, and what their burden would have to be, they would have to show acts of inducement directly linked to the Sprint and Altel direct infringement. The evidence of that was from depositions in February of 2006. And so in that few-month period, they had to show that there were actual acts of inducement. There's no evidence in the record on that, and the Commission had also found that there are long lead times before any chip is designed by the handset manufacturer, and by the time it gets deployed on a network. So I would say it's a complete evidentiary failing, Your Honor, and certainly under substantial evidence review, the inducement findings must stand. Do you have a comment on the RTF 60-150, the question I asked Mr. Jones? Yes, I think you described it correctly, and that's one of the problems. The Commission did not reach that, but that's certainly one of our defenses. Okay. Did you raise that before the Commission? Yes. The point that I was discussing? Yes. The Commission only went off on the variable PLL control signal, the ALJ, correct? Yes, that's right. Right, so we couldn't affirm on this ground. That's correct. Under Chenoweth. Right. I find that PLL control signal issue to be a little bit problematical, but I think we have your briefs on that. Okay, fine. Mr. Van Nest, you have five minutes. Thank you, Your Honor. Let me talk about the direct infringement point first. I think the Court has this well in mind. The EVDO standard is not the point. The point is that the Commission found that actual customers were actually using this claimed feature and infringing the patent. So we know from that that the chips and the software that Qualcomm sells are capable of infringing because network providers and handset makers are using them. We also proved that Qualcomm is testing these same chips with the same software on their test network. If the chip and the software... Did you prove they had a network? Yes, we proved... You proved that they had an entire network. Yes, we proved that. Where do I find that proof? If you look at the appendix pages 374 and 375, you will find that everyone assumed that these are tested on a network and there was further testimony that in some instances... Is that enough for everyone to assume that they're testing chips on an entire network? That was not in dispute before the Commission, Your Honor. They have a test network that they test these chips on and these are the same chips and the same software that the customers are using. So the only issue is are they capable? Are they operable? It doesn't matter what the EVDO standard requires. It does require an idle state, but it doesn't necessarily require that you power down in the idle state, which is what the patent calls for and what these chips do. But Motorola and LG and the handset makers and the network providers have added this functionality and they're using it on their networks. The appendix page 375 says, There's no evidence that Qualcomm's test networks contain a second terminal mode having a wireless receiver operable in a power-saving state as recited in Claim 1. That's right, Your Honor, but the test network... There was no dispute that they're operating these devices on a test network and our point is that finding did not have to be made. That was a finding that they weren't actually operating it. All we had to show was that the chips with the software were operable, just like in the Intel case. If it's programmable and that's your claim, then what you have to show is that the chip and the device were programmable, could be operated, and we showed that because customers were actually operating them in this fashion. That reference, Your Honor, points out that it was assumed in the commission and we proved it, that Qualcomm is testing these chips on a full network. It's not just in a layout. It's not just on a bench. So again, our point is the Intel case controls this part of it. It's operable. These chips are operable. They were tested by Qualcomm. There should have been a finding of direct infringement. Why doesn't this case fit under our line of precedent that says if it's just possible to alter a product so as to make it infringe, the fact that it can be altered to make it infringe, in this case the additional software, does not make it infringing? I think it depends on the claim language, Your Honor. I think this case, because it uses the claim term operable, fits with the Intel case. This is the same software. They are the same chips. So it's clearly operable. There could be cases in which you need to make major adjustments that haven't been made. That wasn't the situation here. We showed that the chips with this software can perform the function because Judge Bullock found that they did when used by the customers. Now I want to turn just briefly to inducement. It was said, I think, by both counsel that we did not prove that Qualcomm was directly promoting these features. At page A15620 and again at page A15624, we put in, and this is just a sample, we put in marketing materials given to customers where the very first lead line is power efficient, power efficient, power efficient, and low power is all over these. If that's old news, as Qualcomm's counsel said, then the marketing department didn't get it, because these were going out in 2005 and 2006 after Qualcomm had knowledge of the 311 patent to customers, and as Judge Rader pointed out, of course, the goal is to get customers to use the full functionality of these chips. That's why they're designing them with these features. And again, we accept the standard of DSU, but when you have knowledge of a patent and you're promoting the specific patented features in a chip, by the way, which the court found infringes, both when used by customers and when used by network providers, we've met the standard of DSU that was required and the Commission should have recognized that. Final comments, Mr. Van Ness? The only final comment I have is I'm not sure I can answer Judge Bryson's question on phase lock loop, but I do think, having looked very briefly at the schematic, that with respect to the schematic you're talking about, the reference current comes in from the upper left. Reference current, I know. Reference scale current. I'm not sure that I've been able to identify that. I do know, though, that our point was that by adding all the currents through the entire weighted stack, that's what produced the relevant current. But the reference signal is the PLL. That's the PLL control signal, right? Yes, it is. Okay. It is. Thank you.